[Cite as *Shell v. Durrani*, 2015-Ohio-4140.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| BRENDA SHELL, et al., | : | |
| Plaintiffs-Appellants, | : | CASE NO. CA2014-11-232 |
| | : | O P I N I O N |
| - vs - | : | 10/5/2015 |
| | : | |
| ABUBAKAR ATIQ DURRANI, M.D., et al., | : | |
| Defendants-Appellees. | : | |


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2012-08-2824


Stephanie L. Collins and Matthew J. Hammer, 5247 Madison Pike, Independence, Kentucky 41051, for plaintiffs-appellants

Lindhorst & Dreidame, Michael F. Lyon and Bradley D. McPeek, 312 Walnut Street, Suite 3100, Cincinnati, Ohio 45202, for defendants-appellees, Abubakar Atiq Durrani, M.D. and Center for Advanced Spine Technologies, Inc.

Rendigs, Fry, Kiely & Dennis, Karen A. Carroll and Jeffrey M. Hines, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202, for defendants-appellees, West Chester Medical Center, Inc. and UC Health


**M. POWELL, J.**

{¶ 1} Plaintiffs-appellants, Brenda Shell (Shell) and her husband, John Shell, appeal a decision of the Butler County Court of Common Pleas denying their motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial in a medical malpractice

action against defendants-appellees, Abubakar Atiq Durrani, M.D., and his private practice, the Center for Advanced Spine Technologies (CAST).[1]

{¶ 2} Shell is a 60-year-old retired school teacher who has suffered from chronic back problems over the last 30 years. As a teenager, Shell underwent her first spinal surgery in 1971 to correct a severe scoliosis condition. In 1986, the Harrington rod which had been inserted during the scoliosis surgery was removed when Shell began experiencing pain. The removal of the rod alleviated the pain for several years. In 2000, however, Shell began suffering from severe back pain and sought pain management treatment. After several years of treatment produced no improvement, Shell consulted Dr. Durrani who performed a surgery on her in 2007.

{¶ 3} In 2008, Shell once again began experiencing back pain. On March 4, 2010, Dr. Durrani advised Shell that the screws he had inserted in her spine during the 2007 surgery were loose and that a second surgery was required. During that consultation, Dr. Durrani talked with Shell about the surgical procedure he was going to perform. That surgery took place on March 12, 2010. The day before surgery, Shell signed two separate written consent forms.

{¶ 4} Specifically, on March 11, 2010, Shell first went to the West Chester Hospital (WCH) for preoperative testing, at which time she reviewed, dated, and signed a consent form (the WCH Consent Form). The consent form specifically authorized Dr. Durrani to perform the following procedures: "hardware loosening, lumbar 5 – sacral 1 left sided foraminatomy and decompression, lumbar 5 – sacral 1 AXIAL lumbar inter body fusion." The consent form also contained Shell's acknowledgement that "my doctor has explained" the procedure along with the attendant risks, benefits, side effects, and alternatives.

{¶ 5} After leaving WCH, Shell then went to Dr. Durrani's office at CAST where she

---

1. The other defendants-appellants in this appeal are the West Chester Hospital, LLC, and UC Health, Inc.

reviewed, dated, and signed another consent form (the CAST Consent Form). That consent form did not identify the procedure to be performed or that Dr. Durrani would perform the surgery. However, Shell acknowledged in the consent form that "[her] physician had provided [her] with an explanation of the nature, purpose, risks, complications and alternatives" of the procedure to be performed, discussed with her the general risks and benefits of surgery, explained to her the specific risks of the surgical procedure, which included neurological injury, vascular injury, pleural injury, and bowel injury, and explained to her that complications from surgery might include pseudarthrosis, nerve or artery damage, and hardware failure. In the consent form, Shell also acknowledged she was given an "opportunity to ask questions and seek further information regarding the above items," and that she did "not require further information."

{¶ 6} Dr. Durrani performed surgery on Shell on March 12, 2010. Due to complications during and after the surgery, Shell underwent two additional surgeries by Dr. Durrani in March 2010. Shell testified that as a result of Dr. Durrani's surgeries, she now has bowel and bladder control issues, must catheterize herself daily, has nerve damage and nerve pain in her left leg, cannot control her left foot, and must wear a leg brace.

{¶ 7} On August 1, 2012, Shell and her husband filed a medical malpractice action against Dr. Durrani, CAST, WHC, and UC Health. The complaint set forth several claims, including claims for battery and lack of informed consent based upon Dr. Durrani's failure to obtain Shell's informed consent before the March 12, 2010 surgery. In December 2013, Shell and her husband filed an amended complaint which included, once again, a claim against Dr. Durrani for lack of informed consent. A jury trial was held in August 2014. At trial, Shell testified on her behalf. Dr. Durrani was not present at trial; however, his deposition was read to the jury.

{¶ 8} On August 19, 2014, the jury returned a verdict in favor of Dr. Durrani and

CAST. The jury found that Dr. Durrani was not negligent in treating Shell. The jury further found that Shell gave informed consent to Dr. Durrani for her March 12, 2010 surgery. Consequently, the trial court dismissed all claims against WCH and UC Health. Shell and her husband subsequently moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial on the ground, inter alia, that Dr. Durrani failed to obtain Shell's informed consent for the March 12, 2010 surgery. On November 17, 2014, the trial court overruled the motion.

{¶ 9} Shell and her husband appeal, raising one assignment of error:

{¶ 10} THE TRIAL COURT WAS INCORRECT IN ITS DECISION TO DENY APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON INFORMED CONSENT AND BATTERY.

{¶ 11} Shell argues she was entitled to a judgment notwithstanding the verdict because the CAST Consent Form did not (1) specify the surgery to be performed on March 12, 2010, (2) name the physician who was to perform the surgery, and (3) detail the material risks presented by the surgery. Shell asserts that given the boilerplate language of the CAST Consent Form, Dr. Durrani failed to obtain her informed consent for the March 12, 2010 surgery in accordance with R.C. 2317.54. Shell further asserts it is "the treating doctor [who] has the duty to obtain informed consent, not the hospital."

{¶ 12} We review a trial court's decision on a motion for a judgment notwithstanding the verdict de novo. *Briggs v. Franklin Pre-Release Ctr.*, 12th Dist. Madison No. CA2013-10-035, 2014-Ohio-2477, ¶ 8. A favorable ruling on such a motion is not easily obtained. *Phipps v. Internatl. Paper Co.*, 12th Dist. Clinton No. CA2013-02-003, 2013-Ohio-3994, ¶ 10. The standard for granting a motion for judgment notwithstanding the verdict is the same as that for granting a motion for directed verdict. *Choate v. Tranet, Inc.*, 12th Dist. Warren No. CA2005-09-105, 2006-Ohio-4565, ¶ 48.

{¶ 13} That is, when considering either motion, the evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made. *Phipps* at ¶ 11; *Choate* at ¶ 48. If the court finds that reasonable minds could not differ as to any determinative issue, then the court must sustain the motion. *Briggs* at ¶ 9. If, on the other hand, there is substantial competent evidence to support the nonmoving party, upon which reasonable minds might reach different conclusions, the motion must be denied. *Id.* Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling on either motion. *Nickell v. Gonzales*, 17 Ohio St.3d 136, 137 (1985).

{¶ 14} A lack of informed consent is established when:

> (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any; (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.

*Nickell* at 139. "Informed consent to a medical procedure need not be in writing; it can be given orally." *Cardinal v. Family Foot Care Centers, Inc.*, 40 Ohio App.3d 181 (8th Dist.1987), paragraph one of the syllabus.

{¶ 15} R.C. 2317.54 governs a patient's informed consent to a surgical or medical procedure and provides that:

> (A) The consent sets forth in general terms the nature and purpose of the procedure or procedures, and what the procedures are expected to accomplish, together with the reasonably known risks, and, except in emergency situations, sets forth the names of the physicians who shall perform the intended surgical procedures.
>
> (B) The person making the consent acknowledges that such disclosure of information has been made and that all questions

asked about the procedure or procedures have been answered in a satisfactory manner.

(C) The consent is signed by the patient for whom the procedure is to be performed[.]

{¶ 16} When a written consent form meets the foregoing requirements, such consent is presumed to be valid and effective, and a plaintiff may not deny he gave his informed consent to the procedure performed on him, unless he can establish by a preponderance of the evidence that he was illiterate, or that his consent was induced by fraud or bad faith. R.C. 2317.54; *Johnson v. Brandy*, 2d Dist. Greene No. 93-CA-26, 1995 WL 29230, *3 (Jan. 25, 1995). R.C. 2317.54 further provides that "any use of a consent form that fulfills the requirements stated in divisions (A), (B), and (C) of this section has no effect on the common law rights and liabilities, including the right of a physician to obtain the oral or implied consent of a patient to a medical procedure[.]"

{¶ 17} Thus, "[w]hile a patient's consent must be informed to be effective, it need not be in writing. Informed consent may be given orally. But if consent is in writing and complies with the requirements of R.C. 2317.54, a statutory presumption arises that the consent is valid and effective." *Joiner v. Simon*, 1st Dist. Hamilton No. C-050718, 2007-Ohio-425, ¶ 30.

{¶ 18} We note that although Shell raised a claim of lack of informed consent in her complaint, she solely relies on R.C. 2317.54 in support of her argument. "There is a subtle but distinct difference between these issues." *Werden v. Children's Hosp. Med. Ctr.*, 1st Dist. Hamilton No. C-040889, 2006-Ohio-4600, ¶ 132. The difference was recognized by the Eleventh Appellate District:

> [plaintiff's] argument * * * interchanges the concept of *informed* consent with the more narrow question of a *written* consent form. R.C. 2317.54 provides that written consent is presumed to be valid and effective if it conforms to the specific requirements described by that section. The use of a written consent form under R.C. 2317.54 has no separate impact on the common law rights and liabilities that exist between a physician and a patient.

> In other words, it does not preclude the right of a physician to obtain the oral or implied consent of a patient for a surgical or medical procedure.
>
> Thus, even in the absence of a written consent form, the facts may show that there was, nevertheless, an informed consent.

(Emphasis sic.) *Foreman v. Hsu*, 11th Dist. Trumbull No. 96-T-5559, 1998 WL 683941, *3 (Sept. 30, 1998).

{¶ 19} In support of her argument that Dr. Durrani failed to obtain her informed consent for the March 12, 2010 surgery, Shell focuses solely on the CAST Consent Form which did not specify the surgery to be performed on March 12, 2010, or name the physician who was to perform the surgery (contrary to Shell's assertion, it did list, however, the general and specific risks of the surgery as well as possible complications). Shell's argument, however, completely ignores the import of the WCH Consent Form, a separate consent form which she reviewed and signed the day before her March 12, 2010 surgery. In fact, the record shows Shell signed the WCH Consent Form at WCH *before* she signed the CAST Consent Form later that day at CAST. The WCH Consent Form specifically authorized Dr. Durrani to perform three specifically listed procedures. When considered together, the WCH Consent Form and the CAST Consent Form fulfill the requirements under R.C. 2317.54 for a presumptively valid informed consent. *Joiner*, 2007-Ohio-425 at ¶ 30.

{¶ 20} Shell discounts the import of the WCH Consent Form because it was not obtained by Dr. Durrani. Shell cites a decision of the Second Appellate District in support, asserting that it is "the treating doctor [who] has the duty to obtain informed consent, not the hospital." *See Eiford v. Burt*, 2d Dist. Montgomery No. 12392, 1994 WL 470319 (Sept. 2, 1994).

{¶ 21} *Eiford* involved a physician who performed experimental surgery on a woman at a hospital where he had staff privileges but where he was not an employee. As a result of

the surgery, the woman suffered severe and recurring health problems. The woman filed a complaint against the hospital for fraudulent concealment, arguing the hospital had a duty to warn her about the physician's unorthodox surgery. The trial court found in favor of the hospital. The Second Appellate District held that because the physician was neither an agent nor an employee, the hospital had no duty to inform the woman of the physician's practices and was thus not liable for fraudulent concealment. *Id.* at *8.

{¶ 22} In addressing the woman's argument, the appellate court noted that "the physician-patient relationship undeniably imposes upon *a doctor* the duty to inform a patient about the true nature and extent of any proposed procedure." (Emphasis sic.) *Eiford*, 1994 WL 470319 at *9. The appellate court further stated:

> A hospital does have a duty to prevent improper surgery and injury to its patients. However, the remedy for a breach of this duty is a negligent credentialing action against the hospital for retaining the incompetent physician. Moreover, the patient may also bring a lack of informed consent or fraudulent concealment action against the doctor who withheld information regarding the true nature of the procedure. In addition, when a surgeon is an employee or agent of the hospital, the patient, under appropriate circumstances, may bring a fraudulent concealment claim against the hospital under agency law or the doctrine of respondeat superior. In the present case, however, we perceive Eiford's fraud allegation against [the hospital] as an attempt to circumvent the longstanding rule limiting informed consent actions to physicians.

*Id.*

{¶ 23} We find that *Eiford* is factually distinguishable and is therefore not applicable to the case at bar. In addition, *Eiford* does not hold that a patient's informed consent may only be obtained by the physician, or that informed consent is to be determined solely based upon a written consent obtained from the patient by the physician.

{¶ 24} In addition to the two separate consent forms signed by Shell for her March 12, 2010 surgery, evidence adduced at trial also included the testimony of Shell and Dr. Durrani.

{¶ 25} Shell testified she met with Dr. Durrani twice before her March 12, 2010 surgery. They first met on March 4, 2010, at which time they reviewed a recent CAT scan and talked about the procedure to be performed on March 12, 2010. They met again on March 11, 2010, to go over the procedures Dr. Durrani was going to perform the next day. Shell testified the second meeting was short and that she did not feel Dr. Durrani fully informed her of the procedure during that meeting. Nonetheless, she knew that the procedures listed on the WCH Consent Form were the procedures that Dr. Durrani was going to perform the next day.

{¶ 26} Dr. Durrani testified Shell was "very properly" and "very clearly" explained in March 2010 which procedures were going to be performed on March 12, 2010, which included "an augmentation of fusion, an instrumentation across the L5-S1 intervertebral disc space, and also removal of the pressure across the L5-S1 foramina, so what is called a laminectomy decompression and interbody fusion at L5-S1." Dr. Durrani also testified there was a consent form to that effect which "exactly says what is being done." As a result, he did not "know how she can maintain how she didn't know about it." Dr. Durrani was not asked which consent form he was referring to.

{¶ 27} In view of the entire record and construing the evidence adduced at trial and the facts established by admissions in the pleadings and in the record most strongly in favor of Dr. Durrani and CAST, we find that the trial court properly denied Shell's motion for a judgment notwithstanding the verdict upon the issue of informed consent. *See Nickell*, 17 Ohio St.3d 136; *Rhodes v. Doctors Hosp. N.*, 10th Dist. Franklin No. 79AP-767, 1980 WL 353495 (June 10, 1980). The assignment of error is overruled.

{¶ 28} Judgment affirmed.

PIPER, P.J., and RINGLAND, J., concur.